IN THE

# Supreme Court

OF THE

# STATE OF LOUISIANA.

SUPREME COURT——WESTERN DISTRICT,
OPELOUSAS, : . . . . . . . SEPTEMBER, 1831.

*LABBE'S HEIRS vs ABAT EL AL.*

APPEAL FROM THE COURT OF THE FIFTH DISTRICT, THE JUDGE OF THE SIXTH PRESIDING.

The *construction* and *effect* of an act of voluntary separation, and of a division of property between husband and wife, made in 1805, before the adoption of either of the civil codes, must be determined by the laws of Spain.

According to these laws the husband and wife were considered so far separate persons, that they could validly enter into any onorous contract—a *sale* being the example given to illustrate this doctrine.

The husband and wife were prohibited from making donations to each other during marriage, of property actually in possession; but the wife might renounce her right to the acquets at any time *before, during* and *after* the dissolution of the marriage.

A contract in which husband and wife mutually agree to separate, divide, and each take a specific portion of the community property, and renounce all right and claim to the community of acquets and gains, partakes strongly of the nature of a contract of *exchange*, by which each of the parties gives up all claim to the *whole*, in consideration of obtaining a distinct right and title to *a part* of the matrimonial community property.

Such a separation and division was strictly speaking a partition of common property, and cannot be assimilated to a donation.

The contract of exchange, in 1805, between the husband and wife operated as a good and valid separation of goods between the contracting parties,

Western District, and a dissolution of the community previously existing between them, and a September 1831. renunciation of the acquets and gains subsequently acquired.

LABBE'S HEIRS
vs.
ABAT ET AL.

The voluntary separation of husband and wife, did not produce a legal separation *a menso et thoro.* The husband would still be bound to provide for her maintainance.

The circumstance of the husband having an adulterous intercourse with his *mulatto slave* in the common dwelling, may have *induced* the wife, the more willingly to *abandon his bed;* but is not such an act of legal constraint and coercion on her, or of immorality in him, as to render the contract of exchange, and dissolution of the community of property, *null* and *void.*

If the wife makes a concealed donation by acknowledging subsequently to the marriage, that her husband brought in twenty-five hundred dollars when in fact it was owned by her at the time, such donation by the Spanish laws is only revocable during the life time of the *doner,* and at her instance,

In April 1826, Margaret Decoux, wife of J. B. Bernard Hiliare Decoux, and Julia Decoux, widow of Louis Pellerin, deceased, legal heirs and representatives of Charlotte Julia Labbé, deceased, filed their petition in the district court for the Parish of St. Martin, against Jean Pierre Descuirs, the husband of C. J. Labbe, by a second marriage, on her part, claiming of the defendant sundry paraphernal property, alleged to have been brought into the marriage by their deceased mother with said Descuirs; and one half of the community which is alleged to have existed between them until dissolved by the death of the wife in 1825.

A marriage contract was entered into between C. J. Labbé, (then widow Decoux) and J. P. Descuirs, stipulating that the wife brought $1095 37 worth of property into marriage; the husband's to be ascertained by inventory after marriage, and stipulating that a community of property should subsist between the spouses. They were then married, October 31st, 1781. The parties lived together until May, 1805, when they entered into a voluntary agreement to separate, and to live separate both in person and property. The act of voluntary separation was drawn up and signed, May 21st, 1805, and acknowledged before Henry Hopkins, commandant of Attakapas, the 25th of the same month.

The parties lived and administered each one's property separately, from that period until the death of the wife in 1825. The plaintiffs had an inventory of all Descuirs' estate taken, after the death of the wife, and allege that the community of property never ceased to exist between husband and wife, notwithstanding they lived separate, and had divided their property at the separation.

In December, 1826, Descuirs died, which was suggested to the court in April, 1827. The suit was revived against his heirs. They all renounced, or let judgment go by default, except *two sets;* viz. the representatives of *Magdelione Descuirs,* late wife of Barré, and of *Lucelle Descuirs,* late wife of A. Boutté, deceased; both collateral heirs of J. P. Descuirs, the late defendant. These two sets of heirs put in answers claiming half the community, if it should be decided to have existed, and reserving all their other rights until a final decision of this suit. At the death of Descuirs one, Antoine Abat, a money-broker of New-Orleans, set up a claim to his whole succession, by virtue of an authentic act of sale, passed before P. Pedesclaux, notary public for the parish of Orleans, dated May 19th, 1821. Abat came and took possession of the estate, and was proceeding to dispose of it at public sale, when he was stopped by an injunction, obtained by the plaintiffs, restraining him from any further proceedings, alleging the sale from Descuirs to him to be *simulated* and *fraudulent.*

The injunction case was consolidated with the original suit.

In April, 1929, the plaintiffs were ordered to amend their original petition, and set forth their demand, cause of action, and property claimed, *explicitly.* They did so, and conclude by praying for the restitution of all the wife's paraphernal or dotal property, for half the community alleged to exist in relation to Descuirs' estate, and for the crops made since the death of their ancestor, and for a final partition and settlement with Descuirs' succession. They also pray that the sale from Descuirs to Abat may be declared to be simu-

LABBE'S HEIRS
vs.
ABAT ET AL.

lated, and in fraud of their rights, and accordingly annulled and set aside.

The sale to Abat is alleged to be *fraudulent* and *simulated:*

1st. Because no valuable consideration was given:

2d. Because, if such sale was made for nearly the whole of Descuir's succession, it is simulated and fraudulent, being made with a view to defraud the petitioners of their just rights:

3d. That the property intended to be conveyed, never ceased to belong to Descuirs, and was attempted to be transferred through Abat, for the benefit of a person incapable of receiving a legacy:

4th. That if ever Abat advanced money to Descuirs, he has been abundantly remunerated from the crops he has appropriated to his own use, raised from the plantation since the death of Descuirs:

5th. That as most of the property belonged to the petitioners' mother, it could not be alienated by Derciurs without a valuable consideration.

On the 4th of October, 1829, Abat, by his counsel, D. Seghars, filed exceptions to the petition, and an answer to the merits.

He excepted to the petition—I. That this is an action of partition of a pretended community with which he has nothing to do.

2. Because it purports to be an action of revendication of sundry slaves, without alleging the title by which they are held:

3. Because it purports to be an hypothecary action for the exercise of a right the petitioner's ancestor had to some property, which they allege to have been sold by the husband, and do not state the amount, or specify the property against which this action is to be exercised:

4. Because at the same time it purports to be an action of simulation, directly against this respondent:

5. Because he denies the plaintiff's right to cumulate all those distinct actions, and by making him a party to them, and subjecting him in case of success in either, to costs of suits in which he has no interest.

Answering to the merits, he pleads a general denial: And further answering, sets up an act of sale, from Descuirs to him of his lands and twenty-two slaves, &c. *for a valuable consideration.* He avers he has been in peaceable possession of all this property from the passing of the sale, May 19th, 1821, until arrested by the injunction of the plaintiffs. He denies that any community of property existed between J. P. Descuirs and his late wife, since their voluntary separation in 1805, that Descuirs had a perfect right to sell his estate, and that he was in full possession and has sustained damages to amount of five thousand dollars, by the injunction of plaintiffs.

On the trial, documentary and parol evidence was produced, directed mainly to two points.

1. As to the validity and effect of the voluntary separation of Descuirs and wife in 1805.

2. The validity of the sale of his plantation, slaves, &c. from J. P. Descuirs, to Antoine Abat, in May, 1821.

In regard to the separation, it was proved by the plaintiffs—that ever since their separation in 1805, they continued to live and administer their property separately. Madame Descuirs manifested no desire to return and live with her husband. She said she separated from her husband because he lived with his domestic Josephine, and had more regard for the mulatress than for her: That she never pretended to have any reclamations against her husband since the separation. Josephine and Descuirs continued to live together, and she had a son by him, called Charles. Descuirs acknowledged this child to be his son, and the latter called him father. He also boasted that Charles would figure in the society of Paris, to which he sent him to be educated.

On the part of the defendant it was shown, that Descuirs

and his wife both avowed always after the separation that they were separated in property; and lived and transacted their own business.   Madame Descuirs lived on a separate plantation, and bought and sold her negroes and transacted all her own affairs.   She ever spoke of her husband afterwards with the greatest *indifference*.   She contracted all debts in her own name with the merchants of St. Martinsville.

2d.  The sale to Abat.—Plaintiffs proved that Descuirs always lived, from the time of separation from his wife up to his departure for France in 1825, on the same plantation, working the same slaves, and possessing the same stock and farming utensils which were claimed by Abat in virtue of the sale to him in 1821; that Descuirs shipped and received the proceeds of the crops, and paid physicians' bills and other expenses of the farm.   Descuirs was a prudent, economical man, who never contracted large debts, nor lived extravagantly.   He was not embarrassed.   His plantation and all the stock and other utensils, claimed by Abat, were inventoried by the parish judge in 1825, in his (Descuirs') own name.   The parish judge had several conversations with him after the pretended sale to Abat in 1821—one soon after his return from New-Orleans, in which he said: *"Qu'il avait vendu sans avoir vendu; et qu'il pourrait ravoir son habitation quand il le voudrait."*   One witness dined with Descuirs in 1823 or 1824, who joked him about making him his heir, in order to disinherit his nephew.

Josephine continued to live with Descuirs on the plantation until his departure for France, when he took her with him.   She returned from France to New-Orleans with him.   In conversation, he induced several persons to believe he intended to leave all his property to Josephine and Charles her son; and that he employed Porter and Brent to write his testament, *willing* his estate to Josephine and Charles.   Josephine, since his death, continues to live in a fine house in New-Orleans, which is also well furnished.   Abat never

appeared on the plantation, or to exercise any acts of ownership over it, until after Descuirs departed for France. He said, before leaving it, he had rather die on his way to France than live here. His conduct on starting induced the belief he intended to convey away his property.

On the part of the defendant Abat, witnesses said that, in 1825, after Descuirs started for France, Abat took possession of the plantation, hands, and stock, &c. and put an overseer on it. He received the crops. In 1827, after Descuirs' return to New-Orleans, and death, Abat then offered the plantation, negroes, and all the stock, &c. at public sale; and was proceeding to sell it, until stopped by the plaintiffs injunction;—that Descuirs sold all his household furniture and horses before he set out for France. One witness says he saw Descuirs in New-Orleans at the time he sold his plantation to Abat. He told witness he had sold it, and intended to go to France, but he had agreed to go and live on the farm, to save Abat the expense of hiring an overseer, and to sell some moveables, &c. Witness *heard* that Descuirs took $25,000 or $28,000 with him to France, and invested it in property; that he heard he had purchased to the amount of 120,000f. and again sold it for 96,000f.: *all hearsay.* A clerk in the notary's office says, when Descuirs passed the sale of his plantation and slaves to Abat, the notary counted the money for the price, and paid it over to Descuirs, who took it off with him; the sum appeared not less than twenty, nor more than thirty thousand dollars: it was in bank notes. Witness don't know who brought the money to the office: thinks it was not Abat.

There was judgment for the plaintiffs in the court below, and the defendant appealed.

*Simon,* for plaintiffs, made the following points:

1st. That the act under private signature, made the 21st May, 1805, contains a stipulation of *separation* of property, and of *dissolution of the community;* that it was done amicably and by mutual consent of the parties.

S 3

2d. A voluntary separation of husband and wife, was not permitted by the Spanish laws; and such separation did not put an end to the community of property.—*Feb.* part 2, book 1, ch. 4, nos. 51 and 52. *Ibid,* ch. 4, nos. 1, 2, 46 and 50.

3d. The same rule of law prevailed in France. A separation of husband and wife could not be even submitted to arbitrators, either in Spain or France.—*Poth. Com.* Vol. 2, § 542, 492. *Ibid, Traite des Droites desepoux pour Daubauton,* pp. 73, 164. *Par.* 4, title 10, law 8. *Poth. Com. du Mar.* vol. 2, p. 87, § 517 and 518. *Leyislation Judiciare,* p. 371, *Actes de Notorieté du chatelet de Paris,* p. 178

4th. A judicial sentence is necessary to destroy the community of property, after it once exists.—7th *Mar.* N. S. 50·

5th. The renunciation of the community is the *consequence,* and not the *object,* of the act of separation of 1805. Before renouncing, the community must be dissolved and open. This right of renunciation is given to the wife, *for her benefit,* and for the purpose of avoiding the payment of debts contracted during marriage by the husband. There was no such object in view by the wife, in the act of separation in 1805.—*Gomez ad leges Touro,* 633 and 631, and authorities cited by defendants counsel on the 60th law of Toro. *Poth. Com.* vol. 2, § 542.

6th. The Spanish laws, in giving to the wife the right of renouncing to the community, in order to avoid the payment of the debts of the community, (which renunciation, it is contended, is the *consequence,* and not the *dissolution* itself,) have pointed out certain formalities which, being fulfilled, make the renunciation binding on the wife; but which have not been observed in this case.—*Feb.* part 2, book 1, ch. 4, nos. 59 and 60. *Ibid,* part 1, ch. 5, nos. 9 and 10. *Ibid,* part 1, ch. 5, § no. 43.

7th. All the authorities cited by the adverse counsel go to shew that, under the Spanish laws, all donations between husband and wife are prohibited, and, consequently, the acts containing such donations are *null and void.* This is admit-

ted; and it seems that the act of 1805 contains *an indirect donation* from the wife to her husband, not only by diminishing the amount of her rights, but also by acknowledging his having brought in marriage $2500, which is proven by *nothing* but this *acknowledgment.*

8th. The sale made by Descuirs to Abat was made in fraud of the wife, and is fraudulent and simulated, being in prejudice of her *rights* and those of the *forced* heirs, it ought to be annulled and set aside.—*Recop.* title 4, book 10, law 5.

9th. Simulation may be proved by presumptions. The evidence in this case clearly proves fraud and simulation from the presumptions arising from the mass of facts proven.—*Syrey*, vol. 2, 16. 3d *Martin*, N. S.

10th. The evidence in the cause shews, that the motives and causes of the act of separation of May 21, 1805, were immoral; because the husband lived in open *concubinage* with the *mulatresse* Josephine. On this ground the act ought to be annulled and set aside.

*Bowen*, on same side, contended:

1st. That the motives which led to the act of separation of 1805, between the husband and wife, were so *immoral* that it completely vitiates it; that no acts of the wife, under such circumstances, could have any binding effect; she was *constrained* by the husband's bad and *immoral* conduct to consent to the execution of the act, and no law would require its enforcement in a court of justice.

2d. That the sale from Descuirs to Abat of his estate, is *fraudulent* and *simulated*, as is abundantly proved. Such being the case, it must be annulled and set aside, as far as it relates to the rights and interests of the plaintiffs.

*Seghers*, for defendant, urged the following points, and *errors* in the judgment of the district court.

1st. The judge *a quo* erred in deciding that, by the act of May, 1805, and of the separation of the parties, the wife had renounced the *gananciales*, and that this renunciation is not

binding on her, because she has not *expressly* and solemnly, before a notary,˙renounced all the laws specially in her favour.—*Febrero*, part 2, vol. 1, p. 227, nos. 57, 58, 59, 60. *ibid*, part 1, vol. 2, p. 72, no, 117, and p. 159. Note 44 on no. 117. *Ibid*, part 1, vol. 3, p. 440, no. 21. *Gomez ad leg. Tauri*, pp. 633, 634. *Maticuro*, folio 271, verbo gloss. 1, no. 2, on law 9, title 9, book 5 of *Recopilacion*. No. 9 of same gloss. *Azevedo*, vol. 2, pp. 311, 312, gloss. 1, 2, 3, 4; or the same law of the *Recopilacion*; and which is also the law 60 of Toro. *Nueva Recop.* book 5, title 16, law 2.— *Azevedo*, vol. 2, p. 418. *Matienzo*, p. 419, *recto*. *Moreau's Partidas*, vol. 2, p. 1246, rule 27. *Novissima Recop.* book 3, title 2, laws 3 and 5. 3d *Martin*, N. S. 607. 2d *Martin*, N. S. 672. 1st *Martin*, 259.

2d. The judge *a quo* erred in deciding that the plaintiffs were entitled to recover one-half of the estate of Jean Pierre Descuirs, which he has conveyed to the defendant, on the ground that a community of property continued to exist, after the separation between Descuirs and his wife; and that the said alienation to defendant was fraudulent and simulated, and should be annulled and set aside.—*Febrero*, part 1, vol. 2, ch. 10, no. 10, p. 364. *Gomez, variæ resol.* vol. 2, p. 434, no. 3. *Nov. Recop.* book 10, title 4, law 5. *Ibid*, book 3, title 2, laws 3 and 3.

3d. The judge *a quo* erred, in not dissolving the injunction sued out by the plaintiffs against the intended sale of the property by Abat, and in not awarding to him the damages he has suffered in consequence of that injunction.

*Mazureau* on the same side.

*Mathews*, J. delivered the opinion of the court.

The plaintiffs in this case claim from the defendants an account of the estate of their deceased mother, which, they allege, was˙held in community with him; and pray a decision

---

*Porter*, J. took no part in the decision of this case, being out of the state, under leave of absence, when it was argued.

in their favour for whatever amount may be found to have been the property of the deceased.   Before judgment could be rendered, the defendant Descuirs died; and the suit was prosecuted against his heirs, of whom a great number were cited; and many of them formally renounced the inheritance. During the progress of the cause in the court below, the plaintiffs brought suit against a certain Antoine Abat, to cause a conveyance made to him by Descuirs, during his life-time, of all the property of the latter, to be annulled, on the grounds of simulation and fraud.   These suits were consolidated, and proceedings took place on them, in virtue of which judgment was rendered in favour of plaintiffs, from which the defendant Abat appealed.

The principal facts of the case, as they appear by the documents and testimony, are as follows: In the year 1781 the mother of the plaintiffs (then the widow of Jos. Decoux) and Jean Pierre Descuirs entered into a marriage contract, by which they formed a community of property.   The part of this community which was to be brought in by the husband, was not specified at the time, but was, by agreement, to be ascertained at some future period.   That brought by the wife was estimated at $1095 37.   Their marriage was celebrated in pursuance of this contract.   They lived together under the matrimonial union, holding their property in community, the wife having a right to one-half of the acquets and gains, until 1805.   On the 21st of May, in that year, they entered into a contract, by which both parties agreed to a separation of property, and a dissolution of the community, in presence of several of their neighbours, called in to assist them in the division of the estate—which was divided, both as to the *biens propres* and the *gananciales,* up to that period, each party taking separate possession of the property assigned to them under this division.   They continued in this state of separation until the death of the wife, each party having the use and enjoyment of the portion assigned to them, separately.   The motives for this sepa-

ration are not made known in the contract; it is simply sta-
ted, that it was done by mutual consent.   There is, howev-
er, a probability raised by the testimony of some of the wit-
nesses, that the wife acquiesced in this measure the more
readily, in consequence of a supposed criminal intercourse
between her husband and a young mulatto slave, belonging
to the household: for, after the separation of property and
dissolution of the community, the spouses lived no longer to-
gether.   There is no evidence of any personal abuse, or ill-
treatment exercised by the husband towards his wife, or that
he drove her by force from his bed and board.   At the time
of the dissolution of the community, the property which
each of the parties brought into it, originally amounted, by
estimation, to $25,000; and on this basis the whole, both
capital and profits, was equally divided.   Abat, the appel-
lant, produced in evidence an authentic act, clothed with all
the formalities of law, by which it appears that Descuirs'
sold to him all his estate, &c.   The act of separation, &c.
which was made in private form, was acknowledged by the
parties before a person exercising the functions of judge and
notary, immediately after the occupation of Louisiana by the
United States, was recorded, and a copy is taken from the
archives of the parish of St. Martin.

On these facts several questions of law are raised:

1st. Whether the act of separation of goods, and dissolu-
tion of the community, is valid and binding on the parties,
in any respect, according to the laws in force in this country,
at the time of its execution?

2d. If good as to the *gananciales*, whether it is not void
as to the $25,000 acknowledged to have been brought into
the community by the husband, on the ground of this part of

The *construction*
and *effect* of an act
of voluntary sepa-
ration, and of a di-
vision of property
between husband
and wife, made in
1805, before the

the stipulations in said act being a disguised donation to the
husband by the wife, not tolerated by law?

A *third* question relates to the truth and genuineness of
the deed of sale from Descuirs to Abat.

For a solution of the first two of these questions we must

resort to the Spanish laws, which afford the only *legitimate* rules by which the acts of the parties are to be construed. According to these laws it is clear that husband and wife were considered so far separate persons; that they could validly enter into any onerous contracts between themselves. A sale is the example given to illustrate this doctrine. They seem to have been prohibited only from making donations to each other, during the marriage, of property actually in possession. By the same laws the wife was permitted to renounce her rights to the matrimonial acqets and gains, at any time before, during, or after the dissolution of the marriage. These rights and disabilities are fully established by *Gomez ad leges Tauris,* and in his treatise entitled *Barœ Resolutiones,* by *Febrero, Maliengo,* and other authorities.— See *Gomez en leges Taure,* 633 and 634. *Varce Resolutione,* p. 434. *Maliengo,* folio 271. *Verzo,* no. 2. *Febrero,* part 1, ch. 10, § 1, no. 2; and part 2, book 1, ch. 4, § 2, no. 57, 58, 59 and 60.

The contract by which Descuirs and his wife agreed, in 1805, to a separation of property, and dissolution of the matrimonial community which had previously existed between them, may be considered as partaking strongly of a contract of exchange, by which each one of the parties gave up his common right or claim to all the property, in consideration of his having obtained a separate and distinct title to a part. It was, strictly speaking, a partition of common property, and cannot be assimilated to a donation. It is well known that contracts of exchange, and agreements to divide a common property, create many obligations between the parties to such contracts very similar to those which arise out of the contract of sale. We, therefore, conclude that the contract of 1805 did operate a good and valid separation of goods between the contracting parties, and dissolution of the community which previously subsisted between them, and a consequent mutual renunciation of any community of acquets and gains which may have been acquired, subsequent to that

Western District, *September* 1831.

LABBE'S HEIRS
*vs.*
ABAT ET AL.

adoption of either of the civil codes, must be determined by the laws of Spain.

According to these laws the husband and wife were considered so far separate persons, that they could validly enter into any onorous contract—a *sale* being the example given to illustrate this doctrine.

The husband and wife were prohibited from making donations to each other during marriage, of property actually in possession; but the wife might renounce her right to the acquets at any time *before, during* and *after* the dissolution of the marriage.

A contract in which husband and wife mutually agree to separate, divide, and each take a specific portion of the community property, and renounce all right and claim to the community of acquets and gains, partakes strongly of the nature of a contract of *exchange,* by which each of the parties gives up all claim to the *whole,* in consideration of obtaining a distinct

Western District, September 1831.

LABBE'S HEIRS *vs.* ABAT ET AL.

*right and title to a part of the matrimonial community property.*

*Such a separation and division was strictly speaking a partition of common property, and cannot be assimilated to a donation.*

*The contract of exchange, in 1805, between the husband and wife operated as a good and valid separation of goods between the contracting parties and a dissolution of the community previously existing between them, and a renunciation of the acquets and gains subsequently acquired.*

*The voluntary separation of husband and wife, did not produce a legal separation a mensa et thoro. The husband would still be bound to provide for her maintainance*

*The circumstance of the husband having an adulterous intercourse with his mulatto slave in the common dwelling, may have induced the wife, the more willingly to abandon his bed; but is not such an act of legal constraint and coercion on her, or of immortality in him, as to render*

period, by the parties to the contract. It cannot be considered as having produced a legal separation, *a mensa et thoro.* The husband would probably have been obliged to provide for the maintenance of his wife, or to have afforded her bed and board, had she required it at his hands. It is true, the testimony shews, that after the execution of this contract, a voluntary separation of persons took place between the parties; but we have no evidence of any violence, or actual constraint exercised by the husband or his wife. The suspicion of an adulterous intercourse between him and his mulatto slave, may have had its effect on his wife to induce her the more willingly to abandon his bed. But, perhaps, this contract would not have afforded a legal ground for a separation, as the municipal laws of Spain and, probably, of most other countries, are much more indulgent to acts of incontinency done by husbands, than offences of this kind committed by wives. The reason given by legislators for this distinction, is, that in the one case there's danger of a spurious offspring, which does not exist in the other. This is true. And it is perhaps equally evident, from the different degrees of rigour applied by law to the same moral offence in the different sexes, that men, and not women, have, in all ages, been the makers of laws. Be this as it may, we are of opinion that the conduct of the husband, in the present instance, did not amount to a legal constraint or coercion of his wife, in such a degree as to authorize a court of justice to declare the contract null. Having been made by parties capable of contracting, and by mutual consent, it should be held as valid *in toto,* unless some of its provisions contain stipulations reprobated by law. From these observations, applicable to the entire agreement, we come to consider that part of it which is alleged to cover a donation from the wife to the husband.

In relation to this question we may be very brief: for, admitting that a concealed donation was made of the $2500, acknowledged to have been brought into the community by

the husband, being unsupported by any other evidence except this acknowledgment, it was revocable by the laws then in force, only, during the life-time of the donor, and at her instance; in other words, it became valid by her death.—— *Gomez in leges Tauri*, laws 50, 51, 52 and 53, no. 65.

With regard to this contract not having been sanctioned by the oath of the wife, we are of opinion that this omission does not, in any manner, impair its legal validity. If its stipulations are directly contrary to law, then such an oath could not give them validity *in foro legis;* and if they are in accordance with law, they require not the sanction of an oath to make them valid and binding on the parties.—See 11 *Mar.* 529.

Being of opinion that the plaintiffs have not shewn a right to any part of the succession of J. P. Descuirs, and as the contest between them and Abat depends solely on the recognition of such right in them, it is deemed unnecessary to examine the third question proposed, which relates to the sale from Descuirs to him.

It is therefore ordered, that the judgment of the district court be avoided, reversed, and annulled. And it is further ordered, adjudged, and decreed, that judgment be here entered for the defendants in both those cases as consolidated, with costs in both courts; reserving to the heirs of J. P. Descuirs their rights (if any they have) to pursue Abat, to obtain a recision of the sale made to him by their ancestor.

*Western District, September 1831.*

LABBE'S HEIRS
*vs.*
ABAT ET AL.

the contract of exchange, and dissolution of the community of property, *null* and *void.* If the wife makes a concealed donation by acknowledging subsequently to the marriage, that her husband brought in twenty-five hundred dollars when in fact it was owned by her at the time, such donation by the Spanish laws is only revocable during the life time of the *donor,* and at her instance.